# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2020 CA 0887

### HEIRS OF PETER HILL

### VERSUS

### JAMES H. WELSH COMMISSIONER OF CONSERVATION OF THE STATE OF LOUISIANA OFFICE OF CONSERVATION

Judgment Rendered:      APR 1 6 2021

\* \* \* \* \* \*

On Appeal from the Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
No. 634,111

Honorable Trudy M. White, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Brent K. Delee<br>Kirby J. Guidry<br>Baton Rouge, Louisiana | Counsel for Plaintiffs/Appellees<br>Heirs of Peter Hill |
| F. Jonathan Rice<br>John W. Adams<br>Daniel D. Henry, Jr.<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellant<br>Richard P. Ieyoub, Commissioner of<br>Conservation of the State of Louisiana<br>Office of Conservation |

\* \* \* \* \* \*

BEFORE:  GUIDRY, McCLENDON AND LANIER, JJ.

**McCLENDON, J.**

This is an appeal from a district court's judgment that reversed an order issued by the Commissioner of Conservation of the State of Louisiana, Office of Conservation (the Commissioner), concerning the creation of drilling and production units. For the reasons that follow, we reverse the judgment of the district court and reinstate the Commissioner's decision.

## FACTS AND PROCEDURAL HISTORY

In 2007, the Office of Conservation authorized drilling and oil production on property owned by A. Wilbert's Sons, L.L.C. (Wilbert's Sons) in West Baton Rouge Parish near Maringouin, which was under lease with TMR Exploration, Inc. (TMR). Wilbert's Sons Well 93 No. 1 was completed and began producing in 2008. In 2010, TMR transferred its interests to Park Exploration, Inc., who sold to Vitol Resources, Inc. (Vitol) in 2012.

On March 11, 2014, Vitol filed an application with the Commissioner to create two 320-acre compulsory drilling and production units for the Cockfield Zone, Reservoir A, Erwinville Field in West Baton Rouge Parish, including the property around Wilbert's Sons Well 93 No. 1.[1] The involved landowners, Wilbert's Sons, the Heirs of Peter Hill (the Hills) and Charles Salemi, countered with proposals of their own. Vitol and Wilbert's Sons reached an agreement regarding the size of the units, but the Hills and Salemi presented a proposal for a single unit of approximately 167 acres around Wilbert's Sons Well 93 No. 1. Following a hearing on the matter, the application presented by Vitol was adopted by the Commissioner, pursuant to Order No. 1575-A, which confirmed CF RA SUA and CF RA SUB, the two 320-acre units. The Hills and Salemi then requested a rehearing with the Commissioner to consider additional evidence, which was denied, and on October 10, 2014, the Hills timely filed an appeal of Order No. 1575-A to the district court. The Commissioner answered the petition and filed a certified copy of the administrative record into the district court record.

---

[1] At the time the application was made, James H. Welsh was the Commissioner of Conservation. Richard P. Ieyoub is the current Commissioner.

Thereafter, on August 23, 2017, the Hills filed in the district court a rule to show cause why a rehearing before the Commissioner should not be ordered. The Hills argued that that the Commissioner's denial of their request for rehearing was arbitrary and capricious and contrary to the law and evidence, in light of "the amount of important new evidence, unconsidered issues, and other good grounds." On November 14, 2017, the district court granted the Hills' request and ordered the Commissioner to grant the Hills a rehearing. On December 18, 2017, the district court signed its judgment and ordered that the matter be remanded for rehearing and limited to the record filed by the Commissioner "in these proceedings, together with all exhibits and material evidence filed by [the Hills] in this proceeding." On June 26, 2018, the Commissioner conducted the rehearing and considered the additional evidence offered by the Hills. On July 30, 2018, the Commissioner issued Order No. 1575-A-1, effective on and after June 26, 2018, upholding and confirming its previous order.[2]

On September 12, 2018, the Hills filed a Petition for Appellate Review of Order No. 1575-A-1 in the same docket number as their petition for appellate review of Order No. 1575-A. In response, the Commissioner filed peremptory exceptions of res judicata and no cause of action, as well as the dilatory exception of non-conformity with the requirements of LSA-C.C.P. arts. 891 and 893. The district court denied the exceptions on July 30, 2019.

Subsequently, on June 25, 2019, the Hills filed a rule to show cause why Order No. 1575-A-1 should not be modified. On August 26, 2019, the district court heard the Hills' rule to show cause and took the matter under advisement. On May 27, 2020, the district court issued written reasons, finding that the substantial rights of the Hills had been prejudiced, as the Commissioner's decision was arbitrary and capricious and an abuse of discretion, and ordered the Commissioner to adopt the 167-acre unit as proposed by the Hills. The district court signed a judgment on July 3, 2020, in conformity with its ruling.

---

[2] When Order No. 1575-A-1 became effective, Urban Oil and Gas Group, LLC had been confirmed as the operator of the two units, replacing Vitol.

The Commissioner appealed and assigned the following as error:

1.  The district court erred in denying the peremptory exceptions raising the objections of res judicata and no cause of action when the Hills untimely filed their petition for appellate review of Order No. 1575-A-1, by failing to follow the procedures set forth in LSA-R.S. 30:12 in perfecting their appeal.

2.  The district court erred in substituting its judgment for that of the expertise of the Commissioner in overturning Order No. 1575-A-1 in finding that the record did not support two 320-acre drilling and production units and substituting the Hills' proposed 167-acre unit that is unsupported by the evidence.

3.  The district court erred in holding the Commissioner's exclusion of evidence was arbitrary and contrary to law by imposing Code of Civil Procedure and Louisiana Code of Evidence rules on an administrative hearing when the Commissioner has its own procedural rules for conducting hearings.

## DISCUSSION

The Office of Conservation, within the Department of Natural Resources, exercises the functions of the state with respect to the regulation, conservation, and use of the natural resources of the state, which are not specifically within the jurisdiction of other state departments or agencies. LSA-R.S. 36:358A and 36:358C.[3] The Commissioner of Conservation has jurisdiction and authority over all persons and property necessary to enforce effectively all laws relating to the conservation of oil or gas, and has authority to make, after notice and hearings as provided by law, any reasonable rules, regulations, and orders that are necessary from time to time in the proper administration and enforcement of the conservation laws. LSA-R.S. 30:1; LSA-R.S. 30:4; **Davidson v. Welsh**, 10-2213 (La.App. 1 Cir. 6/17/11), 2011 WL 2448226, at *3 (unpublished), writ denied, 11-1590 (La. 10/7/11), 71 So.3d 318.

---

[3] The Office of Conservation's functions include, but are not limited to: the conservation of the oil and gas resources of the state and matters pertaining thereto; the promotion and encouragement of exploration, production, and refining efforts for oil, intrastate gas, and other hydrocarbons; the control and allocation of energy supplies and distribution; the lease or construction and operation of intrastate pipeline systems; the implementation and enforcement of any emergency gas shortage allocation plan and the setting of priorities; regulation of the minimum sale price of intrastate natural gas; and management of ground water resources. LSA-R.S. 36:358C.

4

For the prevention of waste and to avoid the drilling of unnecessary wells, the Commissioner has the authority to establish drilling units. LSA-R.S. 30:9B. At the time of the original hearing, a drilling unit was defined as the maximum area which may be efficiently and economically drained by one well. Currently, a drilling unit means the maximum area which may be efficiently and economically drained by the well or wells designated to serve the drilling unit as the unit well, substitute unit well, or alternate unit well.[4] LSA-R.S. 30:9B. This unit shall constitute a developed area as long as a well is located thereon that is capable of producing oil or gas in paying quantities. **Id.**

In determining the location and extent of a drilling unit and well, the Commissioner is required to consider all available geological and engineering evidence and shall provide for the unit well to be located at the optimum position in the drilling unit for the most efficient and economic drainage of such unit, so that the landowners receive their just and equitable share of the oil and gas in the pool. LSA-R.S. 30:9C and 30:9D.

In this matter, the Commissioner first argues that the district court erred in the denial of its peremptory exceptions raising the objections of res judicata and no cause of action. Specifically, the Commissioner alleges that the Hills untimely filed their appeal of Order No. 1575-A-1 by failing to follow the procedure set forth in LSA-R.S. 30:12.

Louisiana Revised Statutes 30:12A provides:

(1) A person who is aggrieved by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the assistant secretary of the office of conservation hereunder, or by an act done or threatened hereunder, and who has exhausted his administrative remedy, may obtain court review by a suit for injunction or judicial review against the assistant secretary as defendant.

(2) Suit for review shall be instituted in the district court of the parish in which the principal office of the assistant secretary is located and must be brought within sixty days of the administrative action that is the subject of the suit. In cases of judicial review of adjudication proceedings, the sixty days shall begin to run after mailing of notice of the final decision or order, or if a rehearing is requested within sixty days after the decision thereon.

---

[4] Louisiana Revised Statutes 30:9B was amended by Acts 2015, No. 253, § 1.

5

The Commissioner suggests that because the 2017 judgment on the first petition for judicial review remanded the matter for further proceedings before the Commissioner, the limited jurisdiction of the district court ended, and the filing of the second petition for judicial review in the existing docket number was improper to serve as a timely appeal of Order No. 1575-A-1.

Contrarily, the Hills maintain that their petition for judicial review was filed thirty-four days after the Commissioner's decision on rehearing, clearly within the sixty-day requirement of LSA-R.S. 30:12A(2), and in the proper district court and parish, in the 19th Judicial District Court in East Baton Rouge Parish. Because their petition for judicial review of Order No. 1575-A-1 was timely and properly filed, the Hills argue that this assignment of error is without merit.

As previously set forth, the record shows that on December 18, 2017, the district court ordered the Commissioner to grant a rehearing regarding Order No. 1575-A. The district court also remanded the matter to the Commissioner to hold the rehearing to consider additional evidence offered by the Hills. On June 26, 2018, the Commissioner conducted the rehearing and considered the additional evidence. On July 30, 2018, the Commissioner issued Order No. 1575-A-1, effective June 26, 2018. As there was no "final decision or order" in this matter until the Commissioner issued Order No. 1575-A-1, the sixty days did not begin to run until June 26, 2018, and the Hills' request for judicial review was timely. Moreover, we find that nothing in LSA-R.S. 12:30A prevents the timely appeal of an order following rehearing in the same suit number as the original appeal. The Commissioner has not cited any authority, nor is this court aware of any, that supports its argument. Accordingly, we find no error by the district court in denying the exceptions.

In its second assignment of error, the Commissioner asserts that the district court erred in substituting its judgment for the Commissioner's expertise when the record shows that Order No. 1575-A-1 was not arbitrary, capricious, or manifestly erroneous. The Commissioner contends that the district court acted in the role of trier of fact, instead of applying the appropriate standard of review found in LSA-R.S. 30:12B. Moreover, the Commissioner asserts that the adoption of the 167-acre unit

6

was not supported by the evidence and would result in numerous acreage gaps throughout the Cockfield formation, resulting in either acreage being taken out of commerce or the drilling of unnecessary wells. Rather, according to the Commissioner, the adoption of the 320-acre units has a rational basis in the administrative record and must be upheld.

On the other hand, the Hills contend that the there was insufficient evidence to support Order 1575-A-1, which created the two 320-acre units, as the evidence, as supplemented, supported their position that the well was incapable of draining 320 acres. Therefore, according to the Hills, the Commissioner was arbitrary and capricious, as well as clearly erroneous, in its decision, and the district court was correct in reversing the Commissioner and creating one 167-acre unit around the existing Wilbert's Sons Well 93 No. 1 as proposed by them.

The standard for the district court's review of a Commissioner's order is found in LSA-R.S. 30:12B, which provides that such review shall be conducted by the court without a jury and confined to the administrative record. LSA-R.S. 30:12B(4). The statute further provides:

> The court may affirm the decision of the assistant secretary or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (a) In violation of constitutional or statutory provisions;
>
> (b) In excess of the statutory authority of the agency;
>
> (c) Made upon unlawful procedure;
>
> (d) Affected by other error of law;
>
> (e) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (f) Manifestly erroneous in view of the reliable, probative, and, substantial evidence on the whole record. In the application of the rule, where the assistant secretary has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the assistant secretary's determination on credibility issues.

LSA-R.S. 30:12B(5). The plaintiff has the burden when challenging the Commissioner's order, and all pertinent evidence with respect to the validity or reasonableness of the

7

order shall be admissible. LSA-R.S. 30:12C(2); **Louisiana Environmental Action Network v. Welsh**, 16-0906 (La.App. 1 Cir. 6/14/17), 224 So.3d 383, 386.

On questions of law, the reviewing court owes little or no deference to the Commissioner's decision; however, the Commissioner's findings of fact are reviewed under the manifest error standard. **Louisiana Environmental Action Network**, 224 So.3d at 386. Where the Commissioner has the opportunity to judge the credibility of witnesses by first-hand observation of their demeanor on the witness stand and the reviewing court does not, due regard must be given to the Commissioner's credibility determinations. Further, in reviewing the Commissioner's conclusions and exercises of discretion, the reviewing court must apply the arbitrariness test, and the party challenging the Commissioner's decision must make a clear showing that the administrative action was arbitrary and capricious. **Id**. Moreover, the court is not empowered to substitute its judgment for that of the Commissioner. In other words, if the Commissioner's decision has a rational basis in the administrative record, it should be upheld. **Summers v. Sutton**, 428 So.2d 1121, 1129 (La.App. 1 Cir. 1983).

Thereafter, if a party is dissatisfied with the judgment of the district court following judicial review, the aggrieved party may obtain review to the appropriate appellate court. See LSA-R.S. 30:12D. In reviewing the district court's judgment, no deference is owed by the court of appeal to the factual findings or legal conclusions of the district court, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. **Louisiana Environmental Action Network**, 224 So.3d at 386. Consequently, this court will conduct its own independent review of the record and apply the standards of review provided by law. **Davidson**, 2011 WL 2448226, at *4.

In the case *sub judice*, Remy Williams, Vitol's petroleum geology expert, testified at the initial hearing on June 24, 2014, regarding the exhibits submitted in support of the proposed 320-acre units. Mr. Williams described the Cockfield Reservoir as an unconventional reservoir type that is approximately eight miles long and two miles wide. He testified that Vitol owned approximately 23,000 acres of Cockfield Reservoir leases and that when Vitol became involved, there were no Commissioner's units in the

8

Erwinville Field. Mr. Williams stated that the proposed 320-acre units were appropriate and necessary for future development of horizontal wells that were the best and "really the only commercial way" to develop the Cockfield Reservoir and that Vitol had already determined that it probably would not be drilling any more vertical wells. Additionally, Mr. Williams stated, Vitol had already begun to develop on areas of 320 acres in the field, as there were already two voluntary units of 320 acres and another 320-acre unit pending before the Commissioner.

Mr. Williams further testified that Vitol discovered that the lease for Wilbert's Sons Well 93 No. 1, which was created before Vitol's acquisition, left off the interests of the Hills and Salemi, as the bottom hole of the well was under the property of the Hills and within 330 feet of the Salemi tract. He stated that the proposed units were also necessary to correct this problem associated with the well.[5]

Mr. Williams testified that the adoption of the 320-acre units proposed by Vitol would efficiently and economically drain the unit areas. It was his opinion that the proposed units were fair and reasonable and ensured the landowners the opportunity to recover their fair and equitable share of the reservoir content. Further, Mr. Williams stated that 320-acre units was "probably the minimum they need out there to develop this situation and to keep people whole, to keep our acreage intact that we have time to drill it all, and to keep our lessors in commerce."

Mr. Williams also testified that Vitol's proposal would prevent waste and avoid the drilling of unnecessary wells. He believed that the 167-acre units proposed by the Hills would result in numerous gaps on their acreage.[6] Mr. Williams also believed that smaller units would result in other landowners being deprived of their opportunity to

---

[5] The Hills have filed a subsurface trespass claim in the 18th Judicial District Court in West Baton Rouge Parish, which is not the subject of this appeal.

[6] In discussing one of Vitol's exhibits, a map of the area in which the 167-acre units proposed by the Hills and Salemi were drawn, Mr. Williams stated:

> Once again, I show you that I put these particular units around the perforated intervals of the existing horizontal wells out here, and you'll notice the gaps that are left. There are gaps everywhere in here on this acreage that the operator owns. There's almost no way to be able to drill other wells in between based on the 167 acre size units out here. This is something that is going to hurt Vitol down the road. It will also hurt any landowners down the road as the – you'll eventually have some of that acreage out of commerce if the 167s are adopted here.

recover their just and equitable share of the reservoir content and would take productive acreage out of commerce.[7]

Further, regarding Wilbert's Sons Well 93, No. 1, Mr. Williams testified that, according to Vitol's plan, the Wilbert's Sons' interest would be eighty percent and the combined Hill/Salemi interest would be twenty percent, which was more closely aligned with the parties' ownership interests.[8] According to Mr. Williams, this was "a lot more equitable to the Wilbert's and actually to Peter Hill and the Salemi tracts" than the Hill/Salemi plan, which would result in thirty-eight percent to Hill/Salemi and sixty-two percent to Wilbert's Sons.

When questioned on cross examination as to what evidence he had that justified that the wells could drain 320 acres, Mr. Williams answered:

> I haven't supplied any of that. I haven't shown any reservoir characteristics. The key to here is that this is one large reservoir, okay. These wells are going to drain that one large reservoir, and that's why we believe 320 acres are much more appropriate than 167s, because we will not be able to drill in 167s if we're going to do it commercially and economically and effectively. We need the longer laterals.

In opposition to the 320-acre units, the Hills presented their plan for 167-acre units and offered the testimony of their expert in petroleum geology, David Sturlese. Mr. Sturlese opined that none of the evidence presented by Mr. Williams indicated that the units could drain a 320-acre unit. Mr. Sturlese testified that out of approximately 2,586 acres in the Cockfield Reservoir, sixteen wells had been drilled, which indicated that approximately 160 acres could be drained by each well. He believed that a pattern

---

[7] Mr. Williams testified:

> Well, once again, this is a large, you know, eight-by-two-mile area right on this particular map that we're looking at here, for the most part, and it is all one reservoir. It is a depletion drive not a water drive, so any of these wells out here can produce for years and years, and they are eventually probably going to drain certainly more – they could easily drain more than 320 acres, but as long as – this is all one interconnected reservoir, development on 320s makes a lot more sense than 167s. You're basically – you're looking at long-term production. Now, is that going to be economic in the short run? Probably not, but with better techniques and lowering your expenses and just having better production, it can certainly work out, but it's going to also take a lot of time of development. It's going to – you're not going to be able to develop on 160s. You're going to run out of acreage. You're going to lose stuff as you – you've just got to drill a lot of unnecessary wells.

[8] According to Mr. Williams, the Wilbert's Sons' tract covers close to eighty percent of the unit area in CF RA SUA, and the remaining Hill/Salemi interest was just over twenty percent. Mr. Williams also testified:

> I've also taken the Wilberts 93 No.1 Well, and I've gone down to where we believe the productive parts of the perfs are, and I've outlined that in green as you can see on the well path. You'll notice that 80 percent of those perfs are on the Wilberts, 20 percent are on the Peter Hill tract there[.]

10

of 167-acre units was "much more just and equitable" for the landowners than 320-acre units. Additionally, Mr. Sturlese testified on cross-examination that he believed the field was not one big reservoir, but rather individual reservoirs. He also believed that 167-acre units were reasonable for horizontal wells.

The Hills also found of particular importance the deposition testimony of Hugh Wishart, Vitol's geologist, in the trespass suit filed in the 18th Judicial District Court. Mr. Wishart's testimony, submitted as part of the additional evidence on rehearing, indicated that the drainage area of the Wilbert's Sons Well 93 No. 1 was 218 acres. The Hills argued that Mr. Wishart's testimony proved that the well could not drain 320 acres.

In issuing its order, the Commissioner determined that the creation and adoption of drilling and production units of 167 acres as proposed by the Hills and encompassing all existing and future wells drilled in the Cockfield Zone, Reservoir A would create gaps between competitive units in the reservoir. The Commissioner explained that this was contrary to its policy because such gaps would prevent un-unitized acreage the opportunity to recover its just and equitable share of the contents of the reservoir.

The Commissioner also found that the supplementary evidence submitted by the Hills indicated that the 160-acre drainage area was an estimate, as was the 218-acre drainage area estimate, and that the conflicting drainage estimates do not indicate a precise drainage area per well. The Commissioner further stated that the conflicting estimates were not a predominant factor in determining the optimal competitive unit size and configuration for the efficient and economical drainage of the reservoir.

The Commissioner concluded that the review of the available geological, engineering, or other appropriate information included in the record and in the material evidence filed, with the exception of any seismic related material evidence, indicated that it would be reasonable and in the interest of conservation to confirm, approve, and adopt the units designated as CF RA SUA and CF RA SUB as drilling and production units for the Cockfield Zone, Reservoir A, in the Erwinville Field in West Baton Rouge

11

Parish.[9] Accordingly, the units previously adopted were confirmed and continued in effect in Order No. 1575-A-1.

As a reviewing court, we must give full review to the facts of the particular case and determine the reasonableness of the order. **Davidson**, 2011 WL 2448226 at *5. Extensive evidence, documentary and testimonial, was presented herein, including the supplemental evidence of the Hills. After a careful reading of the record and applying the correct standard of review, we cannot say that the Commissioner's decision was arbitrary or capricious, nor was it manifestly erroneous.

The evidence and testimony presented suggested drainage areas of 160, 218, and 320 acres, and the Commissioner determined that a unit smaller than 320 acres would not be the maximum area that could be drained by the units. Additionally, evidence was presented indicating that Order 1575-A-1 prevents waste and the drilling of unnecessary wells in acreage covered by the two units in the Cockfield Reservoir. See LSA-R.S. 30:9B. The record reasonably and sufficiently supports the Commissioner's issuance of Order 1575-A-1, and, despite conflicting evidence, based on the deference given to the Commissioner's credibility determinations, we find that there is no showing that the substantial rights of the Hills were prejudiced. Accordingly, we reverse the decision of the district court and reinstate the Commissioner's decision.

In its remaining assignment of error, the Commissioner asserts that the district court erred in holding that it excluded material evidence arbitrarily and contrary to law. Having found merit in the Commissioner's second specification of error, we need not address this assignment of error.

## CONCLUSION

Considering the foregoing, we reverse the judgment of the district court and reinstate the decision of the Commissioner. Costs of this appeal are assessed to the Heirs of Peter Hill.

**JUDGMENT REVERSED; COMMISSIONER'S DECISION REINSTATED.**

---

[9] The Commissioner found that the material evidence filed by the Hills included volumetric reservoir maps, characterizations, calculations, and estimations that indicated such data were obtained in part from the integration of three dimensional seismic data and available well data, and pursuant to the Office of Conservation's Seismic Policy Memorandum dated April 6, 2000, such integrated data and interpretations could not and were not utilized in the review of the material evidence to determine unit boundaries.